FILED
07/31/2024
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 4, 2024

# IN RE CARTIER H., ET AL.

**Appeal from the Juvenile Court for Davidson County**
**No. PT267148          Sheila Calloway, Judge**

_____

## No. M2024-00203-COA-R3-PT

_____

This is the second appeal involving termination of the mother's parental rights to her two children. In the first appeal, this Court vacated the trial court's finding that the mother failed to manifest an ability and willingness to assume custody of the children and that termination was in the children's best interest. We remanded the case for the trial court to make additional factual findings and conclusions of law. On remand, the trial court entered an amended order with additional findings and conclusions. The mother appeals again. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed and Remanded**

CARMA DENNIS MCGEE, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Nicholas Perenich, Jr., Nashville, Tennessee, for the appellant, Amanda H.

Jonathan Skrmetti, Attorney General and Reporter, and Carrie Perras, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I. FACTS & PROCEDURAL HISTORY

This appeal concerns a petition to terminate the parental rights of Amanda H. ("Mother") to her two sons, Cartier and Cayden. This case was previously before this Court on appeal in *In re Cartier H.*, No. M2022-01576-COA-R3-PT, 2023 WL 7158076 (Tenn. Ct. App. Oct. 31, 2023) ("*Cartier I*"). In *Cartier I*, we set forth the following facts

concerning the removal of the children from Mother's home and related dependency and neglect proceedings:

On April 9, 2018, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") received a referral alleging psychological harm of two children, Cartier, born in February 2011, and Cayden, born in December 2014. The referral stated that the children's mother, Respondent/Appellant Amanda H. ("Mother"), was paranoid and had barricaded herself and her children in her home based on her belief that her neighbor had hired a man to break into her home to kill her. The referral further alleged that Mother stated that she planned to buy a gun to protect herself and the children. The children admitted that they had been up all night and that Cartier did not go to school. As a result of this incident, Mother was involuntarily committed to Tennova Healthcare and the children were removed and placed in DCS custody.

DCS then moved to be granted emergency custody of the children and for them to be declared dependent and neglected. On April 11, 2018, the Davidson County Juvenile Court ("the trial court") granted DCS's petition for emergency custody. The children were placed with a foster family, where they remained throughout the custodial episode.

A juvenile court magistrate later issued an order finding the children dependent and neglected on August 1, 2018. Therein, the trial court found that at the time of the removal, Mother was paranoid and delusional, that she had been diagnosed with bipolar disorder, but was not taking her medication, and that Mother has "unaddressed mental health issues resulting in her involuntary commitment[.]" Following rehearing, the juvenile court judge sustained the allegations in the dependency and neglect petition and specifically found that the children were suffering from the unaddressed mental health issues of Mother, that she suffered from a mental health breakdown at the time of the removal of the children, and that Mother was paranoid and delusional.

*Id.* at *1 (footnotes omitted).

In November 2021, DCS filed a petition[1] in the juvenile court to terminate the parental rights of Mother, alleging the following grounds: (1) abandonment by failure to provide a suitable home; (2) persistent conditions; (3) mental incompetence; and (4) failure

---

[1] The petition also concerned the parental rights of Cartier's father and Cayden's father. Cayden's father executed a surrender of his rights at trial. The trial court ultimately ordered that the parental rights of Cartier's father be terminated, and he did not appeal.

to manifest an ability and willingness to assume custody. DCS further alleged that it was in the children's best interest for Mother's parental rights to be terminated. The petition was heard in August 2022. The court heard testimony from Mother, a court appointed special advocate, the foster mother, a DCS family services worker, and a juvenile court officer.

The court first heard testimony from Mother. Mother testified that after the children entered foster care, she was hospitalized multiple times in mental health facilities. She stated that she was last hospitalized approximately one year before trial in 2021. She explained that she had seen the same physician for mental health treatment, Dr. Hamilton Small, for 20 years, and she was prescribed Zyprexa.[2] Mother described her treatment with Dr. Small as follows:

> A. We just talk about -- we mostly have a lot of laughter. It's mostly about a lot of good times, just about where I go, what I do, how much fun I have every day, and places I see and view. You know, that's mostly what we talk about.
>
> Q. Are there any kind of stresses or mental health things you work on when you're having therapy with him?
>
> A. No. We just talk about me being silly and having a ball in life is pretty much it.

Mother also testified regarding her criminal history. She stated that she had been arrested three or four times since the children entered foster care, with her last arrest occurring more than a year prior to trial. According to Mother, she was referred to mental health court after her last arrest. After a juvenile court officer testified that Mother had three pending warrants against her for failing to appear in general sessions criminal court, Mother was questioned about how she would care for the children if she were to be arrested on the warrants. She replied that she would contact the children's fathers or arrange for the children to be placed in a "private" foster home.

Concerning housing, Mother testified that she moved out of her home a month after the children were removed because her lease was not renewed. Thereafter, she lived in two different domestic violence shelters. In 2019, she moved into a three-bedroom apartment where she resided at the time of trial.

The court also heard testimony from the foster mother, who testified concerning the children's development. She stated that Cartier was in special education classes and had

---

[2] Zyprexa is an antipsychotic medication. *Cartier I*, 2023 WL 7158076, at *2 (citing *Cole v. State*, No. M2016-00625-CCA-R3-PC, 2017 WL 809943, at *2 (Tenn. Crim. App. Mar. 1, 2017)).

an IEP for "basically everything." Cartier progressed academically in her home and made significant improvements in his ability to read and write. She testified that Cayden attended speech therapy and had an IEP for his speech, but he was likely to "graduate" from it within the year. The foster mother stated that she and her husband have a close relationship with Cartier and Cayden, and it was their desire to adopt the children should they become available. She further stated that Cartier and Cayden play with the other children in her home, and they see the other kids as brothers and sisters.

Concerning Mother's visitation with the children, the foster mother testified that there were "a lot of no-shows and disruptions." She stated that from 2018 to 2021, there was "one good visit in a month." Between 2020 and 2021, the children had phone or video visits with Mother, and these visits were short because they would end with Mother "screaming and cussing" and telling the children that they were coming back to her home. After July 2021, however, the visits were more frequent and more stable, typically occurring twice a month. The foster mother described that for about two weeks after a visit with Mother, the children would exhibit rebellious behavior. According to the foster mother, Cayden asked about Mother twice, and Cartier never asked about Mother. She further explained that she sometimes did not tell the children that they were going for a visit until they were on their way because the children were reluctant to attend visitation. The foster mother also described that after Mother told the children that they would be returning to her home, "[t]here was sort of like a fear that would come over [the children's] face," and they would cry.

The court also heard testimony from Paula Allen, a court appointed special advocate. She stated that she observed at least six visits between Mother and the children. According to Ms. Allen, at the first visit she observed, Mother was "fairly involved" with the children, and at a few later visits, Mother brought them toys and snacks. However, Ms. Allen stated that, with the exception of the first visit, Mother did not engage with the children at all. She recalled that at one visit, Mother sat at a different table than Cartier and Cayden, and in another visit, she "sat down and looked at her phone" while the children watched television and played games. She also stated that Mother fell asleep during one visit. Ms. Allen further testified that Mother did not show up to at least two of the visits. She also recalled that at the conclusion of one visit, the children did not want to hug their mother.

Ms. Allen also testified concerning the children's relationships in the foster home. She stated that the children have a "very comfortable relationship" with the foster parents and are bonded with the other children in the foster home. She characterized Cartier and Cayden's interactions with the other children in the foster home as "very, very appropriate." She recalled that when she first met Cartier, he could not read or count. However, he made significant academic progress in the foster home.

Reba Terry, a family services worker from DCS, also testified. She testified that

- 4 -

she worked on the children's case since August 2020. Concerning Mother's visitation with the children, Ms. Terry stated that in the visits she supervised, there was limited interaction between the children and Mother. She recalled that Mother would get snacks for the children, but for the majority of the visits the children would play with each other or watch videos while Mother would sit and watch. However, she further recalled that at one visit, Mother did get on the floor with the children to play a game. Ms. Terry also expressed concern about Mother's behavior throughout the case. She stated that Mother participated in family team meetings telephonically and would often become agitated and hang up. Mother also cursed often and would "get loud" during these meetings. Ms. Terry stated that, during a visit in October 2021, Mother stripped one of the children down to his underwear in order to put lotion on his arms and legs, leaving the child uncomfortable. Mother also stated at a few visits that the children would be returning to her home by a certain date. Ms. Terry recalled that one of the times Mother said this, Cartier started sobbing and went to the foster mother to hug her. Although Ms. Terry stated that there were a few meaningful visits between the children and Mother, she opined that there was not a meaningful bond between them. She testified that the children would have to be encouraged to greet and say bye to Mother and to engage with Mother during the visits.

Ms. Terry also testified concerning Mother's mental health treatment. She stated that Mother reported that she was seeing Dr. Small for her treatment, and Ms. Terry confirmed that she received multiple letters from Dr. Small on behalf of Mother.[3] However, Ms. Terry testified that she was not able to obtain records from Dr. Small because Mother refused to sign a release of information. According to Ms. Terry, Mother stated that she would not sign the release because she had signed one in the past and was not going to sign again.[4] Ms. Terry further testified that a parenting assessment and a psychological assessment recommended that Mother complete additional mental health treatment so that she can demonstrate an ability to parent.

In addition to the testimony, several records concerning Mother's mental health treatment were admitted into evidence. In 2018 and 2019, Mother was hospitalized several times in mental health facilities. The records further showed that Mother had been hospitalized before the children were removed from her home, including when she was 15 years old. She had diagnoses of bipolar I disorder, depression, post-traumatic stress disorder, panic disorder, and attention deficit hyperactivity disorder. The records further showed that Mother had numerous delusional beliefs about the children. For instance, in August 2018, Mother was hospitalized after reporting that one of the children was in a dumpster in a parking lot. Approximately one year later, Mother was arrested after she threatened people with a knife, claiming that they had kidnapped the children and forced

---

[3] The record contains a June 2021 letter from Dr. Small. The letter stated that Mother was seen "for her routine, schedule [sic] appointment[,]" and that she was compliant with her medications and treatment plan.

[4] Ms. Terry testified that the releases expired after a year, and DCS needed a new release to be signed each year.

them to sell drugs. In one evaluation, she claimed that she was married to a famous rap artist and that her children were on tour with him.

In October 2022, the juvenile court entered an order terminating Mother's parental rights. The court found that DCS proved by clear and convincing evidence the following grounds against Mother: (1) abandonment by failure to establish a suitable home; (2) persistent conditions; (3) mental incompetence; and (4) failure to manifest an ability and willingness to assume legal and physical custody of the children. The court further found that it was in the best interest of the children for Mother's parental rights to be terminated. Mother appealed.

In *Cartier I*, this Court affirmed the trial court's holding that DCS proved by clear and convincing evidence the ground of mental incompetence against Mother. *Id.* at *5-8. Because DCS did not defend the grounds of abandonment by failure to establish a suitable home and persistent conditions, we reversed these grounds. *Id.* at *5. Based on insufficient findings from the trial court, we vacated the trial court's finding that the ground of failure to manifest an ability and willingness to assume custody existed as to Mother and that termination was in the best interest of the children. *Id.* at *9-15. Thus, we remanded the case to the trial court to make more detailed written findings of fact and conclusions of law. *Id.*

On remand, the trial court entered a more detailed amended order, finding that the grounds of mental incompetence and failure to manifest an ability and willingness to assume legal and physical custody of the children existed as to Mother and that termination was in the best interest of the children. Mother thereafter filed a timely notice of appeal of the trial court's amended order.

## II. ISSUES PRESENTED

Mother presents the following issues for review on appeal, which we have slightly restated:

1. Whether there was clear and convincing evidence to find that Mother failed to manifest an ability or willingness to personally assume legal and physical custody or financial responsibility for the children and placing them in her custody would pose a risk of substantial harm to the welfare of the children;
2. Whether there was clear and convincing evidence to find that Mother was mentally incompetent to resume the care and responsibility for the children in the near future;[5]

---

[5] In *Cartier I*, this Court affirmed the trial court's finding that the ground of mental incompetence existed as to Mother. *Cartier I*, 2023 WL 7158076, at *5-8. "[W]hen an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case which generally must be

3. Whether there was clear and convincing evidence that termination of Mother's parental rights was in the best interest of the children.

For the following reasons, we affirm the decision of the trial court and remand for further proceedings consistent with this opinion.

### III. STANDARDS APPLICABLE TO TERMINATION CASES

It is well established that "[a] parent's right to the care and custody of [his or] her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re Carrington H.*, 483 S.W.3d 507, 521 (Tenn. 2016). "Parental rights have been described as 'far more precious than any property right.'" *In re Neveah M.*, 614 S.W.3d 659, 674 (Tenn. 2020) (quoting *In re Carrington H.*, 483 S.W.3d at 522). "No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Kaliyah S.*, 455 S.W.3d 533, 556 (Tenn. 2015). Nevertheless, parental rights are not absolute. *In re Carrington H.*, 483 S.W.3d at 522.

Tennessee Code Annotated section 36-1-113 "sets forth the grounds and procedures for terminating the parental rights of a biological parent." *In re Kaliyah S.*, 455 S.W.3d at 546. Pursuant to this statute, the petitioner seeking termination of parental rights must prove two elements. *Id.* at 552. First, the petitioner must prove the existence of at least one of the statutory grounds for termination set forth in Tennessee Code Annotated section 36-1-113(g). *Id.* Second, the petitioner must prove that termination of parental rights is in the best interests of the children under the factors set forth in Tennessee Code Annotated section 36-1-113(i). *Id.* Due to the constitutional dimension of the rights at stake, the petitioner seeking termination must prove both elements by clear and convincing evidence. *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010); *see* Tenn. Code Ann. § 36-1-113(c). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005), and eliminates any serious or substantial doubt about the correctness of these factual findings." *Id.* (citing *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002); *State, Dep't of Children's Servs. v. Mims (In re N.B.)*, 285 S.W.3d 435, 447 (Tenn. Ct. App. 2008)).

---

followed upon remand by the trial court, and by an appellate court if a second appeal is taken from the judgment of the trial court entered after remand." *Memphis Publ'g Co. v. Tenn. Petroleum Underground Storage Tank Bd.*, 975 S.W.2d 303, 306 (Tenn. 1998). Thus, "under the law of the case doctrine, an appellate court's decision on an issue of law is binding in later trials and appeals of the same case if the facts on the second trial or appeal are substantially the same as the facts in the first trial or appeal." *Id.* Simply put, "a court will generally refuse to reconsider an issue that has already been decided by the same court in the same case." *In re Neveah W.*, 525 S.W.3d 223, 236 (Tenn. Ct. App. 2017). Because we affirmed the ground of mental incompetence in *Cartier I*, we decline to consider that ground in this second appeal and proceed to consider the sole remaining ground, failure to manifest an ability and willingness to assume custody.

Because of this heightened burden of proof applicable in parental termination cases, we adapt our customary standard of review on appeal. *In re Audrey S.*, 182 S.W.3d at 861. We review the juvenile court's factual findings de novo in accordance with Rule 13(d) of the Tennessee Rules of Appellate Procedure, presuming each factual finding to be correct unless the evidence preponderates otherwise. *In re Carrington H.*, 483 S.W.3d at 524. We then make our own determination regarding "whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights." *Id.* (citing *In re Bernard T.*, 319 S.W.3d at 596-97). In regard to conclusions of law, "[t]he trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness." *Id.* (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).

## IV.    DISCUSSION

### *A. Failure to Manifest an Ability & Willingness to Assume Custody*

The sole ground at issue on appeal is failure to manifest an ability and willingness to assume custody. This ground exists when:

> A parent . . . has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child . . .

Tenn. Code Ann. § 36-1-113(g)(14). There are two prongs necessary to prove for this ground: "(1) the parent . . . failed to manifest an ability and willingness to personally assume legal and physical custody or financial responsibility of the child; and (2) placing the child in the parent's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child." *In re Neveah M.*, 614 S.W.3d at 674.

Our supreme court has explained that the first prong "places a conjunctive obligation on a parent . . . to manifest both an ability and willingness to personally assume legal and physical custody or financial responsibility for the child." *Id.* at 677. Therefore, if the petitioner "seeking to terminate parental rights proves by clear and convincing proof that a parent . . . has failed to manifest <u>either</u> ability or willingness, then the first prong of the statute is satisfied." *Id.* (citing *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at \*13 (Tenn. Ct. App. June 20, 2018)). A parent's ability is evaluated based "on the parent's lifestyle and circumstances." *In re Zaylee W.*, No. M2019-00342-COA-R3-PT, 2020 WL 1808614, at \*5 (Tenn. Ct. App. Apr. 9, 2020) (quoting *In re Ayden S.*, No. M2017-01185-COA-R3-PT, 2018 WL 2447044, at \*7 (Tenn. Ct. App. May 31, 2018)).

A parent demonstrates willingness, on the other hand, "by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child." *Id.* (citing *In re Ayden S.*, 2018 WL 2447044, at *7). "The analysis of a parent's failure to manifest an ability and willingness to assume custody or financial responsibility focuses on the parent's actions throughout the life of the child." *In re Isabella G.*, No. M2022-00246-COA-R3-PT, 2023 WL 1131230, at *12 (Tenn. Ct. App. Jan. 31, 2023) (citing *In re Neveah M.*, 614 S.W.3d at 677).

As for the second prong, a court "examines the effect that placing the child in the parent's custody would have on the child—namely, whether the parent's assumption of custody would present 'a risk of substantial harm to the physical or psychological welfare of the child.'" *In re Sylvia H.*, No. E2020-01009-COA-R3-PT, 2021 WL 1098630, at *7 (Tenn. Ct. App. Mar. 23, 2021) (quoting Tenn. Code Ann. § 36-1-113(g)(14)).

We first address Mother's ability and willingness to assume custody of the children. The trial court found that "Mother's demonstrated severe and persistent mental illness . . . has rendered her unable to assume legal and physical custody of the children for more than five years." The record supports this finding. Mother has an extensive history of significant mental health issues. The record showed that Mother often experienced delusions that concerned the children, and her delusions led to the children being exposed to weapons and dangerous situations. Despite Mother's mental health issues resulting in numerous hospitalizations, Mother continued to downplay the severity of her illnesses and the importance of her mental health treatment. Although she testified that she was receiving treatment from Dr. Small, she stated that her treatment consists of "talk[ing] about [her] being silly and having a ball in life[.]" Thus, from her description of her treatment, it does not appear that Mother is devoted to overcoming the obstacles presented by her delusions and other mental health issues to enable her to provide safe and stable care for the children. Therefore, we find that Mother has failed to manifest an ability and willingness to assume custody of the children.

Second, we address whether placing the children in Mother's custody would pose a risk of substantial harm to the physical or psychological welfare of the children. Mother's ongoing mental health issues pose an obvious risk of harm to the children. *See In re Brianna B.*, No. M2019-01757-COA-R3-PT, 2021 WL 306467, at *6 (Tenn. Ct. App. Jan. 29, 2021) ("And parents with a significant, recent history of . . . mental illness . . . could lead to a conclusion of a risk of substantial harm."); *see also In re Piper B.*, No. M2017-00930-COA-R3-PT, 2018 WL 3954328, at *10 (Tenn. Ct. App. Aug. 17, 2018) (finding a risk of substantial harm where "Mother has mental health issues for which she has not completed treatment"). As previously discussed, in April 2018, the children were barricaded in their home due to Mother's delusions. After the children were removed from her home, Mother continued to experience delusions, many of which involved the children. She further exhibited instability at trial, where she had numerous profanity-laden outbursts and where she minimized the severity of her illnesses. For this reason, we find that placing

- 9 -

the children in Mother's custody poses a risk of substantial harm to the physical or psychological welfare of the children. Accordingly, we conclude that the trial court did not err in finding that DCS proved by clear and convincing evidence this ground for termination as to Mother.

### B. Best Interest of the Children

Mother also presents an issue as to whether the trial court erred in finding that it was in the best interest of the children to terminate her parental rights. The Tennessee Supreme Court has summarized the law regarding the best interest analysis as follows:

> Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." *In re Kaliyah S.*, 455 S.W.3d at 555 (citing *In re Audrey S.*, 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." *Id.* When considering these statutory factors, courts must remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." *In re Audrey S.*, 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. *Id.* "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child . . . ." Tenn. Code Ann. § 36-1-101(d) (2017).
>
> Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. *In re Audrey S.*, 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. *White v. Moody*, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. *See In re Audrey S.*, 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. *In re Carrington H.*, 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White v. Moody*, 171 S.W.3d at 194).

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017). The twenty statutory best-interest factors are:

(A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;

(B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;

(C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;

(D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;

(E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;

(F) Whether the child is fearful of living in the parent's home;

(G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;

(H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;

(I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;

(J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;

(K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of

circumstances, conduct, or conditions;

(L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1)(A)-(T). "When considering the factors [above], the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." Tenn. Code Ann. § 36-1-113(i)(2).

We first address those interrelated factors concerning the children's critical need for stability and continuity of placement, the effect a potential change of caretakers and physical environment would have on the children, and the children's parental attachments and emotionally significant relationships with persons other than parents and caregivers.

Tenn. Code Ann. § 36-1-113(i)(1)(A), (B), (H), and (I). The children need stability, and they have experienced stability in their foster home, where they have received necessary therapies and educational interventions which have significantly advanced their emotional and educational development. They have also developed strong bonds with their foster parents and foster siblings, and the children refer to the foster mother as "Mom." The children's relationship with their foster family stands in contrast to their relationship with Mother, with whom they do not have a meaningful bond. Therefore, we find that factors (A), (B), (H), and (I) weigh in favor of termination.

Mother's mental health issues have persisted for much of the children's lives, and she has not demonstrated continuity and stability in meeting the children's needs and has failed to provide safe and stable care for them. *See* Tenn. Code Ann. § 36-1-113(i)(1)(C), (O). Likewise, although Mother participated in visitation with the children, she was often not engaged, and thus, she did not use the visitation to cultivate a positive relationship with them. *See* Tenn. Code Ann. § 36-1-113(i)(1)(E). As a result, Mother and the children do not have a secure and healthy parental attachment, and the children rarely ask about Mother. Due to Mother's ongoing mental health issues, there is no reasonable expectation that she could create such attachment. *See* Tenn. Code Ann. § 36-1-113(i)(1)(D). Furthermore, Mother's behavior and instability have clearly affected the children emotionally, and they expressed fear when Mother told them that they were returning to her home. The children's reluctance to attend visitation and fear of returning to Mother reveal that the children are fearful of living in Mother's home and that Mother's home would exacerbate their past experiences of trauma. *See* Tenn. Code Ann. § 36-1-113(i)(1)(F), (G). Therefore, we find that factors (C), (D), (E), (F), (G), and (O) weigh in favor of termination.

Regarding factor (L), Mother argues on appeal that DCS did not provide reasonable efforts. Mother specifically points out that Ms. Terry testified that DCS did not provide Mother with any "practical hands-on services" to improve Mother's ability to parent. Considering the totality of the circumstances, especially Mother's refusal to sign a release to enable DCS to verify that she was receiving adequate mental health treatment, we find that DCS's efforts were reasonable. *See* Tenn. Code Ann. § 36-1-113(i)(1)(L). DCS engaged in many efforts to help Mother. DCS created three permanency plans for Mother, scheduled supervised visitation with the children, held team meetings, and informed Mother of hearings. Thus, we find that factor (L) weighs in favor of termination.

The children were removed from Mother's home in April 2018 due to the neglect they experienced as a result of Mother's mental health issues. *See* Tenn. Code Ann. § 36-1-113(i)(1)(N). Despite DCS's efforts after the children's removal, Mother did not utilize available resources or demonstrate a sense of urgency in addressing her mental health issues to make it safe for the children to return to her home. *See* Tenn. Code Ann. § 36-1-113(i)(1)(J), (K), and (M). As previously discussed, Mother refused to sign a release for DCS to obtain her medical records from Dr. Small, and she continued to downplay her

mental health issues and exhibit inappropriate behavior at trial.  Despite DCS asking Mother not to do so, Mother repeatedly told the children that they were going to return to her home soon, and these conversations greatly distressed Cartier.  By continuing to minimize her mental illness and failing to take responsibility in receiving adequate care for her mental health, Mother has also not demonstrated an understanding of the children's needs or an ability to maintain a home that meets the children's needs.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(P), (Q).  Overall, it is evident that Mother's mental illnesses and lack of adequate treatment would be detrimental to the children and prevent her from parenting effectively.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(T).  Thus, we find that factors (J), (K), (M), (N), (P), (Q), and (T) weigh in favor of termination.

Regarding factor (S), Mother testified without dispute that she made child support payments of $300 per month for the last two years.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(S).  Thus, we find that factor (S) weighs against termination.

Although Mother had maintained stable housing since 2019, there was no proof at trial concerning whether the *physical environment* of Mother's home at the time of trial was safe for the children.  *See* Tenn. Code Ann. § 36-1-113(i)(1)(R).  Therefore, we find factor (R) inapplicable in the present case.

We have reviewed the best interest factors and agree that it is in the best interest of Cartier and Cayden for Mother's parental rights to be terminated.  Accordingly, we conclude that the trial court did not err in finding that termination was in the best interest of the children.

## V.  CONCLUSION

For the aforementioned reasons, we affirm the decision of the juvenile court and remand for further proceedings consistent with this opinion.  Costs of this appeal are taxed to the appellant, Amanda H., for which execution may issue if necessary.

_____
CARMA DENNIS MCGEE, JUDGE